UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSEPH GIAIMO,                                                          REPORT
                                      Plaintiff,                          and
                    v.                                            RECOMMENDATION

SHC SERVICES, INC., *also known as*                        11-CV-00397A(F)
SUPPLEMENTAL HEALTH CARE SERVICES
  LIMITED, *also known as*
SUPPLEMENTAL HEALTH CARE SERVICES,
  INC., *also known as*
SUPPLEMENTAL HEALTH CARE STAFFING
  SPECIALISTS,
                                      Defendants.
_____

APPEARANCES:           THE TARANTINO LAW FIRM, LLP
                       Attorneys for Plaintiff
                       KEVIN P. WICKA, of Counsel
                       1500 Rand Building
                       14 Lafayette Square
                       Buffalo, New York  14203

                       DAMON MOREY LLP
                       Attorneys for Defendant
                       RANDOLPH C. OPPENHEIMER, and
                       ABIGAIL DEIRDRE FLYNN-KOZARA, of Counsel
                       200 Delaware Avenue
                       Suite 1200
                       Buffalo, New York  14202


### JURISDICTION

        This case was referred to the undersigned by Honorable Richard J. Arcara on

July 5, 2011, for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on

Defendant's motion for summary judgment (Doc. No. 37), filed January 17, 2014.

## BACKGROUND

Plaintiff Joseph Giaimo ("Plaintiff" or "Giaimo"), commenced this contract action on May 10, 2011, seeking to recover from his former employer, Defendant SHC Services, Inc. ("Defendant" or "SHC"), wages and commissions allegedly wrongfully withheld following the termination of Plaintiff's employment.  Plaintiff asserts three claims for relief including (1) unjust enrichment ("First Claim"), (2) violation of New York Labor Law Art. 6 ("Second Claim"), and (3) breach of contract ("Third Claim"). Defendant's answer was filed on July 1, 2011 (Doc. No. 6).

On January 17, 2014, Defendant filed the instant motion seeking summary judgment (Doc. No. 37) ("Defendant's motion"), supported by the attached Declaration of Randolph C. Oppenheimer, Esq. in Support of SHC Services, Inc.'s Motion for Summary Judgment (Doc. No. 37-1) ("Oppenheimer Declaration"), the Statement of Undisputed Material Facts in Support of SHC Services, Inc.'s Motion for Summary Judgment (Doc. No. 37-2) ("Defendant's Statement of Facts"), Exhibits 1 through 4 (Docs. Nos. 37-3 through 37-5) ("Defendant's Exh(s). __"), the Declaration of SHC Director of Human Resources Leslie Marsing in Support of SHC Services, Inc.'s Motion for Summary Judgment (Doc. No. 37-5), attaching exhibits A through I ("Marsing Declaration Exh(s). __"), and the Memorandum of Law in Support of SHC Services, Inc.'s Motion for Summary Judgment (Doc. No. 37-6) ("Defendant's Memorandum").  On February 21, 2014, Plaintiff filed Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 39) ("Plaintiff's Memorandum"), the Declaration of Kevin P. Wicka, Esq. (Doc. No. 40) ("Wicka Declaration"), the Declaration of Plaintiff Joseph Giaimo (Doc. No. 41) ("Plaintiff's Declaration"), Plaintiff's

L.R. 56.1 Counterstatement of Material Facts and Responses to Defendant's L.R. 56.1

Statement in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 42)

("Plaintiff's Statement of Facts"), and an Appendix of Exhibits to Plaintiff's

Counterstatement of Material Facts (Doc. No. 43), attaching exhibits A through V (Docs.

Nos. 43-1 through 43-22) ("Plaintiff's Exh(s). __").  On March 14, 2014, Defendant filed

Defendant's Reply Memorandum in Support of SHC Services, Inc.'s Motion for

Summary Judgment (Doc. No. 48) ("Defendant's Reply"), and Defendant's Response to

Plaintiff's Counterstatement of Material Facts (Doc. No. 49) ("Defendant's Statement of

Facts Response").  Oral argument was deemed unnecessary.

Based on the following, Defendant's motion should be GRANTED in part and

DENIED in part.

## FACTS[1]

In 1984, Leo Blatz ("Blatz"), founded in Buffalo, New York, Supplemental Health

Care ("Supplemental"), a company engaged in nurse staffing by recruiting nurses for

placement in various health care facilities throughout the country on a 13-week contract

basis ("placement nurse" or "nurse").  Defendant's Memorandum at 3; Plaintiff's

Memorandum at 2-3.  Plaintiff Joseph Giaimo ("Plaintiff" or "Giaimo"), commenced

working for Supplemental as an intern in 1998, becoming an employee upon graduating

from college in 1999, working for a year and a half as a Housing Coordinator

responsible for locating and securing housing for the nurses who had accepted

employment contracts with Supplemental.

---

[1] Taken from the pleadings and motion papers filed in this action.
[2] Marsing Declaration Exh. A.

On April 4, 2000, Supplemental Health Care issued to each of its employees an Employee Policy Manual ("Policy Manual").[2]  The opening page of the Policy Manual is a letter in which Blatz specifically states that "[u]nless you have signed an additional employee agreement, your relationship[ ][3] with Supplemental Health Care is exactly as outlined under the New York State "At Will Employment" arrangement."[4]  Policy Manual 1.  According to the Policy Manual,

> Vacation time off is paid at the employee's base pay rate at the time of vacation. It does not include overtime or any special forms of compensation such as incentives, commissions, bonuses, or shift differentials. . . . Upon termination of employment, employees will not be paid for unused vacation time that has been earned.

*Id.* at 9.

Although the Policy Manual does not specify how commissions or bonuses are earned and paid to Recruiters or other employees,[5] the Policy Manual does include a paragraph entitled "Severance Pay," providing that

> Supplemental Health Care does not offer severance pay.  All fees and/or commissions for current placements are terminated as of your final day of work. Potential fees and/or commissions for placements in progress are forfeited in their entirety, regardless of the nature of termination.

*Id.* at 12.

In 2000, Blatz sold Supplemental to a group of investors, at which time the company's name was changed to SHC Services, Inc. ("SHC" or "the company"), with one Alan Melver ("Melver") as CEO.  SHC, which is headquartered in Park City, Utah,

---

[3] Unless otherwise indicated, all bracketed material is added.
[4] No copy of New York State's "At Will Employment" arrangement is in the record.
[5] The court notes the only copy of the Policy Manual in the record is not complete; as such, it is possible the payment of commissions or bonuses is addressed in a portion of the Policy Manual that was not filed. Blatz, however, testified at his deposition that he never put in writing the policy by which Plaintiff earned his commissions, other than in an e-mail, Blatz Dep. Tr. at 101 (denying that Supplemental's "salary and commission agreement" were not "in writing").  No copy of any such e-mail is in the record.

maintained the former Supplemental as a Travel Nurse Division of SHC in its Buffalo office ("the Division"), with Blatz employed as president of that Division.[6]

In 2001, Plaintiff became a Recruiter for SHC.  SHC's Recruiters typically earned a base rate of $ 10 per hour and 10% of SHC's profit from their nurse placements ("placement contract profit")[7] although the additional amount varied among Recruiters.[8] Blatz Dep. Tr. at 57.[9]  Plaintiff refers to the additional amounts paid as "commissions," Plaintiff's Statement of Fact ¶ 35 (citing Blatz Dep. Tr. at 57), whereas Defendant refers to the payments as an "override based on the performance of the division," "incentive payments" or "bonuses," Defendant's Memorandum at 4, yet admits the payment was often referred to as "commission."[10]  *Id.* at 10.  The Recruiter received the commissions in two phases, receiving one-half, *i.e.*, 1.65% of the profit, when the nurse signed the contract placing the nurse at one of the health care facilities ("placement contract"), and the second 1.65% of the profit, when the nurse's placement contract ended.  If the nurse signed another placement contract, the Recruiter received another 3.3%

---

[6] Although the date Blatz sold Supplemental Health Care is not in the record, that the sale occurred after Blatz issued the Policy Manual on April 4, 2004, is strongly implied by the fact that the Policy Manual's first page is a letter signed by Blatz as Supplemental Health Care's President, Policy Manual at 1, and an e-mail accompanying the Policy Manual's distribution to "All Supplemental Health Care Employees" stated that "ONLY Leo Blatz, President and CEO will field questions on the content of the policy manual." April 4, 2000 e-mail, Marsing Declaration Exh. A at Bates No. SHC Giaimo 1087.

[7] Although not appearing in the Complaint, both parties use the term "profit."  How the "placement contract profit" for each nurse placed according to a contract is calculated is not in the record but, based on the context in which the term appears, the court presumes "profit" refers to the difference between the amount SHC bills the health care facility using the placed nurses' services and the amount paid to each nurse pursuant to the placement contract between the nurses and SHC. *See* Facts, *supra*, at 3.  Any other definition would defy basic economic sense. Further, the correct calculation of the "profits" is not relevant to this decision.

[8] The record fails to identify any recruiter was paid commissions at the rate of 10%.

[9] References to "Blatz Dep. Tr." are to pages of the transcript of Blatz's deposition, filed as Plaintiff's Exh. B, and portions filed as Defendant's Exh. 2.

[10] In the interest of simplicity, the court refers to the additional payments as "commissions," but makes no finding as to the actual nature of the payments.

commission again payable in two phases, each 1.65%. Blatz developed the payment scheme prior to selling Supplemental.

As a Recruiter, Plaintiff also received an annual base salary and a commission based on his placement of nurses. Plaintiff was quite successful as a Recruiter, eventually being referred to as the "closer" because of his adeptness at closing deals with nurses. Plaintiff also worked with other Recruiters to obtain successful nurse placements, receiving commission on each of the placement contracts filled by all recruiters working within the Division. In particular, for each nurse placed by Plaintiff or another Recruiter, Plaintiff was paid 3.3% of the nurse placement contract profit according to the same two-phase payment scheme developed by Blatz.

Plaintiff estimates he finalized 30 nurse placements per week, was involved in closing every nurse placement within the Division in some capacity, and had personal contact with 80% of all nurses who accepted placement contracts either from Plaintiff or other Recruiters. The nurses with whom Plaintiff had no personal contact generally were working pursuant to an extension of an existing placement contract requiring no new negotiations. Plaintiff also often spoke with nurses who were thinking of leaving their jobs prior to the completion of a placement contract and encouraging those nurses to complete the placement contract if that was financially more profitable for SHC. If a nurse did not begin working pursuant to a placement contract with Defendant, the Recruiter received no commission on the placement contract, *i.e.*, the Recruiter received neither the first 1.65% payment, nor the second 1.65% payment of the nurse's placement contract profit.

Meanwhile, Blatz, who continued after selling Supplemental to work for SHC pursuant to three successive one-year contracts, was advised that his services would not be needed after the expiration of his contract in 2004.  Patricia Kennedy ("Kennedy"), was hired to replace Blatz, becoming president of the Division.  For a three-month period before Blatz was let go, Blatz worked with Kennedy to assist in transitioning the position to Kennedy.  Blatz's employment with SHC was terminated on July 8, 2004.

On July 2, 2004, just before Blatz's employment ended, SHC issued its Employee Handbook for Office Staff ("Employee Handbook"),[11] which replaced the Policy Manual.  The Employee Handbook provides that it shall not "be construed as creating an express or implied contract or guarantee of employment," that "[t]he employment relationship [with SHC] is based on the mutual consent of the employee and Supplemental Health Care," and "[a]ccordingly, at any time, either you or Supplemental Health Care can terminate the employment relationship at will, with or without cause or advance notice."  Employee Handbook at 6.  In contrast to the Policy Manual's provision that "[u]pon termination of employment, employees will not be paid for unused vacation time that has been earned," Policy Manual at 9, the Employee Handbook's vacation time policy states that "[e]arned and unused vacation will be paid out upon termination of employment."  *Id.* at 17.  With regard to the termination of an employee's employment, The Employee Handbook states only that "Supplemental Health Care does not offer severance pay unless defined by a specific termination agreement," *id.* at 29, but, unlike the previous Policy Manual, does not address whether "fees/commissions," Policy Manual at 12, earned by the employee but not yet paid at

---

[11] Marsing Declaration Exh. B; Plaintiff's Exh. G.

the time of an employee's termination are forfeited.  An Employee Acknowledgment Form signed by Plaintiff indicates he received the Employee Handbook on August 31, 2004.  Plaintiff's Exh. G at Bates Stamp SHC Giamo 0119; Marsing Declaration Exh. C. Like the Policy Manual, the Employee Handbook contains no provision regarding the earning or payment of any commissions or bonuses by Recruiters or any other employee.

In September 2004, Michael Jacatout ("Jacatout"), became SHC's CEO.  On September 30, 2004, Plaintiff was promoted to the position of Vice President of Recruiting, and his base annual salary was increased from $ 41,600 to $ 61,600, SHC Employee New Hire or Change of Status Form ("Change of Status Form"),[12] in addition to the 3.3% commission pursuant to the two-payment scheme developed by Blatz. Plaintiff also continued to receive the 3.3% commissions on the profit generated by each of the nurse placement contracts produced by all Recruiters working within the Division.  Despite Plaintiff's promotion, Plaintiff maintains Jacatout did not care for Plaintiff and did not consider Plaintiff a team player.  Plaintiff Dep. Tr. at 114-16, 183. One of the policies Jacatout implemented was requiring all Recruiters execute a "non-compete" agreement, which Plaintiff refused to do.  *Id.* at 115-16.  Defendant denies that Plaintiff's continued employment with SHC was dependent on Plaintiff signing the agreement.

On January 13, 2005, SHC's Human Resources Director Leslie Marsing ("Marsing"), sent an e-mail to all managers in the Buffalo office, including Kennedy and Plaintiff, with a spreadsheet showing, as of January 7, 2005, the accrued and unused vacation and sick time for each SHC employee in the Buffalo office, as well as the

---

[12] Plaintiff's Exh. D; Defendant's Exh. 4 at Bates No. SHC Giamo 0116.

anticipated vacation time that would be available to each SHC employee through December 31, 2005, assuming their continued employment with SHC.  Marsing Declaration ¶ 15 and Exh. D.  The spreadsheet showed that Plaintiff had, as of January 7, 2005, 103 hours of vacation time then available.  *Id.* ¶ 16 and Exhs. D and E.

On Friday, September 2, 2005, Plaintiff spoke with Kennedy regarding his displeasure with the working conditions at SHC under Jacatout.  Plaintiff maintained that Jacatout did not like him and was targeting Recruiters who refused to execute a non-compete form for demotion and depriving such Recruiters of other work-related opportunities.  Kennedy responded to Plaintiff's complaints by suggesting Plaintiff could look elsewhere for other employment, but encouraged Plaintiff to think it over.  Plaintiff advised Kennedy that if he did resign, he expected to be paid commissions on all the outstanding nurse placement contracts as well as for 295.5 hours of unused vacation time at a rate equal to Plaintiff's average hourly compensation, *i.e.*, a rate that included his base salary hourly pay rate of $ 29.61, plus an additional amount calculated by dividing the commissions Plaintiff had earned in 2005 by the number of hours Plaintiff worked in 2005 prior to the termination of his employment.  In an e-mail dated September 2, 2005 ("Sept. 2, 2005 e-mail"),[13] Plaintiff provided Kennedy with the amounts Plaintiff believed he was entitled to be paid upon termination, which included $ 84,541.76 in commissions, and $ 44,697.33 in unused vacation time for a total of almost $ 130,000.  Plaintiff calculated the owed commissions according to the nurse placement contracts for nurses who, as of September 2, 2005, had commenced working pursuant to a placement contract with SHC, yet whose placement contracts ended after September 2, 2005, *i.e.*, those placement contracts for which the first half of the 3.3%

---

[13] Plaintiff's Exh. I.

commission had been received, but not the second half of the commission.   Kennedy

advised Plaintiff to take off the rest of the day while Kennedy finalized the separation

agreement for Plaintiff.

Kennedy did not contact Plaintiff on Monday, September 5, 2005, which was

Labor Day and a scheduled day off.   Nor did Kennedy contact Plaintiff the next day,

September 6, 2005, but did leave a couple of voicemail messages for Plaintiff on

September 7, 2005, advising she had been communicating with SHC Vice President of

Human Resources Jolene Day ("Day"), and Jacatout, but still did not have an answer for

Plaintiff.   By letter to Plaintiff dated September 8, 2005 ("September 8, 2005 Letter"),[14]

Day "confirmed" SHC had accepted Plaintiff's resignation as of September 2, 2005,

enclosing Plaintiff's final paycheck ("final paycheck"),[15] that included Plaintiff's "full pay

through Friday September 2nd, vacation pay out for 139.50 hours and [Plaintiff's] bonus

of $ 13,848.74."   September 8, 2005 Letter.   Plaintiff's final paycheck for the week

ending September 2, 2005, was the end of a regularly-scheduled 2-week pay period

("final paycheck"). The final paycheck included 64 hours of regular pay totaling

$ 1,895.38, 8 hours sick pay totaling $ 236.92, 8 hours vacation pay totaling $ 236.92,

"Bonus" pay of $13,848.72, and 139.5 hours unused/accrued vacation pay of

$ 4,131.35, for total gross earnings and unused/accrued vacation pay of $ 20,349.30.

On Friday, September 9, 2005, Kennedy spoke with Plaintiff by telephone,

advising that SHC was offering Plaintiff $ 49,000 in exchange for Plaintiff's

resignation.[16]   Plaintiff responded by e-mail ("Sept. 9, 2005 e-mail"),[17] that $ 49,000 was

---

[14] Defendant's Exh. 4 at Bates No. P000007.
[15] Marsing Declaration Exh. G.
[16] The record does not indicate whether Kennedy was aware Plaintiff had received his final paycheck.
[17] Plaintiff's Exh. L.

unacceptable and Plaintiff would not resign but would report to work on Monday,

September 12, 2005, unless Plaintiff was advised that his employment had been

terminated.  Plaintiff maintains Jacatout had directed Kennedy to deny Plaintiff his full

commissions and unused vacation time payment, and that if Plaintiff refused to accept

the $ 49,000 within 48 hours, Kennedy should drop the amount offered to $ 26,000.

   Also on September 9, 2005, Plaintiff received a letter ("September 9, 2005

Letter"),[18] from E. Paul Wood, Esq. ("Wood"), an attorney for SHC, stating Plaintiff had

resigned his position as of September 2, 2005, and would receive his final paycheck

representing base pay, commissions, and unpaid vacation through September 2, 2005.

In an e-mail to Wood's administrative assistant Erin Palmer ("Palmer"), dated

September 12, 2005 ("September 12, 2005 e-mail"),[19] Plaintiff responded to Wood's

September 8, 2005 Letter advising he did not resign on September 2, 2005, explaining

the details of the September 2, 2005 meeting with Kennedy and the agreement Plaintiff

believed had been reached regarding Plaintiff's compensation, including that Plaintiff

would be paid all commissions on the nurse placement contracts placed while Plaintiff

remained employed for SHC, totaling $ 84,451.76, as well as 295.5 of accrued but

unused vacation pay totaling $ 44,697.33 based on an hourly rate calculated by adding

to Plaintiff's base hourly wage of $ 29.61, the average hourly commissions earned to

date in 2005 of $ 121.64, for a total hourly reimbursement rate of $ 151.25.  September

12, 2005 e-mail.  By letter dated September 13, 2005 ("September 13, 2005 Letter"),[20]

Wood offered Plaintiff $ 26,000 "which amounts to one month commissions" in

---

[18] Plaintiff's Exh. M.
[19] Plaintiff's Exh. N; Defendant's Exh. 4 at Bates No. P000048.
[20] Plaintiff's Exh. O.

exchange for Plaintiff executing a release of claims against SHC.  Plaintiff did not accept the offer.

Plaintiff, who had been paid $ 207,869.95 in total compensation since the beginning of 2005, then filed a claim with New York State Department of Labor ("DOL") for unemployment insurance benefits.  On October 7, 2005, DOL determined, based on Plaintiff's statement, which Defendant failed to counter, that Plaintiff did not resign on September 2, 2005, but had been terminated by SHC on September 9, 2005, and Plaintiff's unemployment benefits claim was approved.  On October 14, 2005, SHC appealed the DOL's initial determination that Plaintiff was eligible for unemployment insurance benefits and requested a hearing before a referee on the matter.  On January 6, 2006, SCH withdrew their appeal.  In an e-mail from Plaintiff to Wood dated November 7, 2005 ("November 7, 2005 e-mail"),[21] Plaintiff stated that he was "prepared to accept" as severance the $ 49,000 Kennedy had offered on September 9, 2005.

On January 17, 2006, Plaintiff filed an administrative claim ("Administrative Claim"),[22] with New York DOL for unpaid wages and commissions totaling $ 10,174.65 for the week of September 4 through 10, 2005.  Administrative Claim at 2.  Plaintiff's Administrative Claim did not seek payment for any unused vacation time, and explained that because he was not able to access a computer program on which Plaintiff had tracked his commissions at SHC, he estimated the amount of wages and commissions due by dividing by two his total wages, which included his base pay and commissions, from the last two-week pay period for which Plaintiff had received his final paycheck.  *Id.* According to Plaintiff, because the DOL representative with whom Plaintiff spoke

---

[21] Defendant's Exh. 4 at Bates No. SHC Giaimo 0254.
[22] Plaintiff's Exh. T; Defendant's Exh. 4 at Bates No. P000290.

explicitly stated it handled only pre-separation wage and commission claims, and that post-separation claims were beyond their scope of authority, Plaintiff did not seek the full amount of commissions he claims he is due.  SHC then paid Plaintiff an additional week of compensation of $ 1,184.80, but disputed further liability.

In April 2006, SHC issued its "FY 2006 Bonus Plan" ("Bonus Plan"),[23] providing for "3.3% bonus on gross profits generated from [nurse] placements" made by the Division's Recruiting Team, Division Managers and Area Managers.  Bonus Plan at 1. The Bonus Plan specifically states that "[a]ll bonuses are paid on the start date and end date of any given assignment," and that "[a]ll employees must be employed at the time of payment."  *Id.*  Further, the "incentive," as described in the Bonus Plan, is to be paid on the employee's designated bi-monthly pay date provided the associate has earned and is eligible for the "incentive,"  *id.*, an incentive is not earned until it is paid, *id.* at 2, and incentives will not be prorated upon an employee's termination unless the termination results from retirement, death, or long-term disability.  *Id.*

On March 14, 2008, in resolution of Plaintiff's Administrative Claim, the New York State Commissioner of Labor issued an Order to Comply ("Order to Comply"),[24] finding SHC in violation of New York Labor Law § 191 for failure to pay Plaintiff his final week of wages of $ 6,500, as well as $ 2,607.12 in interest and $ 3,250 in civil penalties, for a total sum due of $ 12,357.12.  On April 9, 2008, SHC sought review of the Order to Comply.  On July 8, 2009, the matter was resolved by a Stipulation of Settlement (Stipulation of Settlement"),[25] with the amount of civil penalty reduced to $ 892.88 from $ 3,250, resulting in the total sum due and owing, and SHC agreeing to pay, $ 10,000,

---

[23] Plaintiff's Exh. F.
[24] Marsing Declaration Exh. I.
[25] Complaint Exh. C; Plaintiff's Exh. U.

which figure includes the previously determined $ 6,500 wages to Plaintiff.  Plaintiff was

not a party to SHC's petition for review.


## **DISCUSSION**

### 1.    **Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party

demonstrates that there are no genuine issues as to any material fact and that a moving

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.

2003).  The court is required to construe the evidence in the light most favorable to the

non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party

moving for summary judgment bears the burden of establishing the nonexistence of any

genuine issue of material fact and if there is any evidence in the record based upon any

source from which a reasonable inference in the non-moving party's favor may be

drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322;

*see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a

material fact is "genuine," that is, if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party").  "A fact is material if it 'might affect the

outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35

(2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide

district courts in their determination of summary judgment motions."  *Brady v. Town of*

*Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary

judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit

a reasonable juror to return a verdict in his or her favor on'" an essential element of a

claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec.*

*Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379

(2d Cir. 1992)).  Once a party moving for summary judgment has made a properly

supported showing of the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that

would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes*

*Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created

solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine'

issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir.

1996).

Defendant argues in support of summary judgment that Plaintiff was an at-will

employee who was not owed post-separation commissions, Defendant's Memorandum

at 7-11, the incentive payments, *i.e.*, the 3.3% commissions Plaintiff seeks, were not

earned, *id.* at 11-15; Plaintiff was paid for all unused vacation time, *id.* at 15-16;

Plaintiff's filing of the administrative claim with the DOL bars the instant claims, *id.* at 16-

18; and no written agreement exists to support Plaintiff's breach of contract claim.  *Id.* at

18-21.  In opposition to summary judgment, Plaintiff argues he is owed post-separation

commissions on placements occurring prior to his separation, Plaintiff's Memorandum at

9-13; Plaintiff's claims for unpaid wages are covered by New York Labor Law Art. 6, *id.*

at 14-17; questions of fact preclude summary judgment on Plaintiff's accrued vacation

time and rate of pay, *id.* at 18-20, Plaintiff's claims are not barred by *res judicata*, *id.* at 20-21, issues of material fact preclude summary judgment on the post-separation severance agreement Plaintiff claims he made with Kennedy, *id.* at 21-22, and SHC, by failing to pay Plaintiff in accordance with his demands, has been unjustly enriched. *Id.* at 22-23. In further support of summary judgment, Defendant argues that Plaintiff's claim for post-separation commissions fails because Plaintiff's at-will status bars his claim for any commissions unearned as of Plaintiff's termination, Defendant's Reply at 2-3; Plaintiff seeks incentive compensation, not wages, *id.* at 3-4; Plaintiff seeks incentive compensation that was not earned at the time he separated from employment, *id.* at 4-6; Plaintiff's argument in support of his claim for additional vacation pay is a non-sequitur, *id.* at 6-8; Plaintiff's claims are barred by *res judicata* based on his administrative DOL claim, *id.* at 8; Plaintiff's oral severance agreement claim is unpleaded and baseless, *id.* at 8-9; and Plaintiff's salary dooms his unjust enrichment claim. *Id.* at 10.

## 2.     *Res Judicata*

Because Defendant's argument that Plaintiff's filing of the administrative claim with the DOJ bars Plaintiff's claims under the doctrine of *res judicata*, would, if true, bar Plaintiff's claims here, the court addresses it first. Defendant argues that Plaintiff's claims for post-separation commissions and unused vacation time are barred by the doctrine of *res judicata* because such claims either were, or could have been, raised in Plaintiff's administrative claim filed with the DOL. Defendant's Memorandum at 16-18. In opposition, Plaintiff argues *res judicata* does not bar his claims because the administrative claim sought only unpaid wages for the week of September 4 through 10,

2005, *i.e.*, the period of time for which the DOL determined Plaintiff remained employed by SHC, and that DOL does not possess authority to adjudicate claims for post-separation commissions.  Plaintiff's Memorandum at 20-21.  Plaintiff further maintains that pursuant to N.Y. Labor Law § 198-c(3) ("§ 198-c(3)"), the DOL is without authority to investigate claims for unused vacation time for professionals earning more than $ 900 per week.  *Id*. at 21.  In further support of summary judgment, Defendant argues that Plaintiff's assertion that an unidentified DOL employee told him DOL would not process claims for post-separation commissions and unused vacation time is inadmissible hearsay.  Defendant's Memorandum at 8 n. 10.  Defendant further maintains that Plaintiff's contention he was a commissioned salesman disproves his assertion that § 198-c(3) barred him, as an executive, from seeking post-separation commissions and unused vacation time.  *Id*. at 8 n. 11.

It is well-settled that the doctrine of *res judicata* bars certain claims in federal court based on the binding effect of a past determination in an administrative proceeding on a claim filed with the DOL.  *Ryan v. New York Telephone Co.*, 467 N.E.2d 487, 489-90 (N.Y. 1984) (holding doctrines of *res judicata* and collateral estoppel give conclusive effect to quasi-judicial determinations of administrative agencies rendered pursuant to agency's adjudicatory authority to decide cases brought before its tribunals employing procedures substantially similar to those used in a court of law).  *Res judicata* will bar a subsequent claim where "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been raised in the prior action."  *Monahan v. New York City Department*

*of Corrections*, 214 F.3d 275, 284-85 (2d Cir. 2000) (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).  "Res judicata applies to judgments by courts and by administrative agencies acting in an adjudicative capacity."  *Greenberg v. Board of Governors of Federal Reserve System*, 968 F.2d 164, 168 (2d Cir. 1992) (citing *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422 (1966)).  "Settlements may also have preclusive effect."  *Id.* (citing *May v. Parker-Abbott Transfer and Storage Inc.*, 899 F.2d 1007, 1009 (10th Cir. 1990)).  "The preclusive effect of a settlement is measured by the intent of the parties to the settlement."  *Id.* (citing *May*, 899 F.2d at 1010-11). Subsequent litigation, however, is precluded only when such further litigation involves the same parties and similar facts and legal issues.  *Id.* at 168. (citing *N.L.R.B. v. United Technologies Corp.*, 706 F.2d 1254, 1259 (2d Cir. 1983)).  In the instant case, the evidence in the record establishes that a portion of Plaintiff's claims are barred by *res judicata*.

The doctrine of privity will extend the preclusive effects of an earlier judgment to nonparties in privity with the parties to the earlier action.  *Joint Apprenticeship and Training Council of Local 363, Intern. Broth. of Teamsters v. New York State Dept. of Labor*, 842 F.Supp. 1561, 1566-67 (S.D.N.Y. 1994) (holding because individual apprentices were in privity with union sponsor of apprenticeship training program ("ATP"), judgment against union sponsor in previous action challenging deregistration of ATP supported *res judicata* bar of apprentices' subsequent claim to enjoin deregistration of ATP arising on same operative facts, but on different legal theory). Accordingly, although Plaintiff maintains he was not a party to the Stipulation of Settlement, Plaintiff's Memorandum at 8, which was reached between the DOL and

Defendant, Plaintiff, by filing the Administrative Claim with the DOL, was in privity with

the DOL, such that Plaintiff is bound by the Stipulation of Settlement, and any *res*

*judicata* effect that would preclude further litigation by the parties to the Stipulation of

Settlement would also preclude Plaintiff from further litigating the same matters covered

by the Stipulation of Settlement.

The Stipulation of Settlement provides that Defendant owed Plaintiff wages

totaling $ 6,500 for the period 9/4/05 through 9/10/05.  Stipulation of Settlement

(referencing Order to Comply).  Given that in the Administrative Claim, Plaintiff specified

that he was seeking commissions for that same period of time, *i.e.*, "Payroll Week

Ending Date 9-10-05," Administrative Claim at 2, in the amount of $ 10,174.65, and that

SHC had earlier paid Plaintiff an additional $ 1,184.62 as salary for the week ending

September 10, 2005, Marsing Declaration ¶ 35, the $ 6500 could only represent

commissions the DOL determined were due Plaintiff for that same week.  As such,

Plaintiff is precluded from seeking in the instant action recovery of any salary and

commissions already awarded by the DOL for the pay period ending September 9,

2005.

## 3.    Commissions or Incentive Pay

Although the doctrine of *res judicata* bars Plaintiff from recovering any more

salary or commissions for the pay period ending September 10, 2005, there are issues

of fact as to whether Plaintiff may recover any of the additional pay for those nurse

placement contracts that were in effect, but not completed, following the termination of

Plaintiff's employment.  Plaintiff maintains that the additional pay of 3.3% of the profits

of each placed nurse's salary Plaintiff received were commissions, Complaint ¶¶ 3, 6,

whereas Defendant characterizes these payments as "incentive pay" akin to a bonus, Defendant's Memorandum at 8-13, and the proper classification is critical to the determination whether Defendant is required to make further payments to Plaintiff.

In particular, if the additional 3.3% payment is a commission, as Plaintiff alleges, Complaint ¶¶ 6-8, Plaintiff could have brought his request for further commissions in his Administrative Claim, provided the commissions were earned as of September 9, 2005, his last date of employment with SHC.  *See* N.Y. Labor Law § 190(1) (defining "wages" as including "commissions"); § 191-c (providing time in which employer is required to pay terminated employee commissions "earned" as of the date of termination); and § 196-a(a) (establishing an employee may file with the DOL an administrative claim seeking payment of wages).  Accordingly, if, as Plaintiff asserts, the additional payments he would have received on the nurses contracts in place, but not completed, as of September 9, 2005, qualify as "earned commissions," then Plaintiff could have included such payments in his Administrative Claim and the failure to do so renders Plaintiff barred by the doctrine of *res judicata* from further pursuing such payments pursuant to N.Y. Labor Law.  If, however, such payments are properly classified, as Defendant maintains, Defendant's Memorandum at 2, 7-9; Defendant's Reply at 4-6, as "unearned incentive compensation" akin to bonuses or "override[s] based on the performance of the [D]ivision," Defendant's Memorandum at 4, then Plaintiff could not have included his request for such payments in the Administrative Claim, and *res judicata* does not bar further litigation on such payments because the New York Labor Law provides for recovery of only commissions that are earned as of the terminated employee's last day of work, and Defendant concedes this point.  Defendant's

Memorandum at 9-11 (arguing an incentive payment does not constitute wages under the New York Labor Law).  Incentive payments, overrides, and bonuses are not addressed by the Labor Law.  Nevertheless, regardless of whether the additional payments are properly classified as commissions, incentive payments, overrides, or bonuses, *res judicata* does not bar Plaintiff from seeking such payments under the theory of unjust enrichment.

To recover on a claim for unjust enrichment, a plaintiff must show (1) the other party was enriched, (2) at the party's expense, and (3) "it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (internal quotation marks and citation omitted).  "'The essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.'"  *Id.* (quoting *Paramount Film Distrib. Corp. v. State of New York*, 283 N.E.2d 695, 698 (N.Y. 1972)).  "It is not enough to show that the defendant received a benefit, rather, the plaintiff must identify the alleged benefit conferred and the equitable basis for returning it to state a legally sufficient claim for unjust enrichment."  *Id.* (citing cases).  "Moreover, while privity is not required, the plaintiff must demonstrate that the services were performed for the defendant."  *Id.*

In the instant case, Plaintiff has shown an issue of fact exists as to whether Defendant wrongfully withheld from Plaintiff the second half of the 3.3% of the nurse placement contracts profits which Plaintiff would have been paid had he remained in SHC's employ such that Defendant was unjustly enriched at Plaintiff's expense.

Significantly, there is a question as to whether the making of the full 3.3% payment in two parts, including the first half upon the nurse's commencement of the placement contract, and the second half when the nurse completes the placement contract, is to accommodate SHC's cash flow, or is in recognition of the fact that the second half payment is not earned until the placement contract is complete.  The record is not completely silent on this point, however, with deposition testimony from Plaintiff, Plaintiff Dep. Tr. at 55-56, that after a nurse commenced working pursuant to a placement contract, additional effort by the recruiter who placed the nurse and Plaintiff often was required to ensure the nurse completed the placement contract.  As such, it is possible that a portion of the last half of the additional payment was earned and, thus, should be paid to Plaintiff prorated for the number of days remaining in each nurse's placement contract that was in progress, yet not completed when Plaintiff's employment was terminated.  It is also possible that the first half of the 3.3% payment is commission, whereas the second half is a bonus, or, further, the entire 3.3% payment could be, as Defendant maintains, Defendant's Memorandum at 4, an override.  *See Ades v. John Hancock Mut. Life Ins. Co.*, 225 F.3d 645; 2000 WL 1340546, at * 1 (2d Cir. 2000) (table) (explaining the plaintiff's "overrides" as a payment on commissions generated by sales agents the plaintiff supervised).  Thus, material issue of fact are presented on exactly how much compensation is owed Plaintiff depending on how the trier of fact resolves these issues.

The record is replete with other evidence calling into question whether permitting SHC to retain the last half of the 3.3% payment otherwise owed Plaintiff except for his termination would be against equity and good conscience.  For example, although the

Policy Manual produced prior to Blatz's 2000 sale of the company specifically provided

that "[a]ll fees and/or commissions for current placements are terminated as of your final

day of work.  Potential fees and/or commissions for placements in progress are forfeited

in their entirety, regardless of the nature of termination," Policy Manual at 12, this

provision does not appear in the Employee's Handbook which Defendant maintains

replaced the Policy Manual upon its issuance to all SHC employees in 2004, thus

calling into question whether SHC had decided to discontinue the previous policy of not

making further incentive payments to an employee that might otherwise be owed to an

employee like Plaintiff subsequent to termination.

    That after meeting with Plaintiff on September 2, 2005, and discussing Plaintiff's

concerns and the possibility that Plaintiff would leave SHC if he could receive his

outstanding commissions, Kennedy asked Plaintiff to determine the commissions to

which Plaintiff believed he was entitled, following which Defendant made two offers to

Plaintiff, the first for $ 49,000 and the second for $ 26,000, could be construed by a

reasonable jury as Defendant's acknowledgment that Plaintiff was entitled to some

further payment, which Defendant understood to constitute earned commissions,

following his separation of service, perhaps given the failure to include in the Employee

Handbook the Policy Manual's provision that no such further payments would be made.

This would be consistent with SHC's releasing in April 2006, after Plaintiff's departure,

the Bonus Plan specifying that the additional 3.3% payment to recruiters on gross

profits generated from nurse placement contracts were "bonuses" that were to be paid

in two parts including the start and end date for each nurse assignment pursuant to a

placement contract and, significantly, unlike the Policy Manual, that "[a]ll employees

must be employed at the time of payment."  Bonus Plan at 1.  Further, the "incentive" is

to be paid on the employee's designated bi-monthly pay date provided the associate

has earned and is eligible for the "incentive,"  *id.*, an incentive is not earned until it is

paid, *id.* at 2, and incentives will not be prorated upon an employee's termination unless

the termination results from retirement, death, or long-term disability.  *Id.*  A reasonable

jury could well find that SHC wrote and distributed the Bonus Plan because SHC

understood the failure to carry over the Policy Manual's provision that upon separation

from service, an employee forfeited all commissions to which the employee otherwise

would have been entitled but for the termination of employment, to the Employee

Handbook created, at best, a question as to whether a recruiter was entitled to be paid

those commissions, overrides, or incentives that were in the employee's compensation

pipeline upon separating service.

Nor is there any merit to Defendant's argument, Defendant's Memorandum at 20-

21; Defendant's Reply at 10; that Plaintiff's receipt of a salary bars him from recovering

additional compensation on a theory of unjust enrichment.  In support of this argument,

Defendant relies on *Karmilowicz v. Hartford Financial Services Group, Inc.*, 494

Fed.Appx. 153, 157-58 (2d Cir. 2012), where the Second Circuit held that an terminated

employee's express employment contract providing Plaintiff with a salary prevented the

employee from recovering incentive plan payments under New York common law claim

for unjust enrichment.  Where, however, part of the compensation demanded allegedly

is earned outside the scope of the parties' written agreement, as here, an unjust

enrichment claim for that compensation not covered by the written agreement is not

barred.  *See AHA Sales, Inc. v. Creative Bath Products, Inc.*, 867 N.Y.S.2d 169, 180 (2d

Dep't 2008) ("where the contract does not cover the dispute in issue, a plaintiff may proceed upon a theory of quasi-contract," including unjust enrichment (citing cases)). Significantly, in the instant case, although there is a written contract covering Plaintiff's base salary, Change of Status Form, the contract does not cover the disputed commissions or override payments Plaintiff earned on each nurse placement contract. *AHA Sales, Inc.*, 867 N.Y.S.2d at 180 ("'It is impermissible . . . to seek damages in an action sounding in quasi-contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, *and the scope of which clearly covers the dispute between the parties.*'" (quoting *Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987)) (italics added)).  Further, the instant case contains evidence, undisputed by Defendant, that the 3.3% commission or override payments Plaintiff received were non-discretionary, Blatz Dep. Tr. at 58-59, Kennedy Dep. Tr. at 40-41, 126-27, 140-41,[26] such that their payment to Plaintiff was required, and Plaintiff would not be barred from seeking the payments on his unjust enrichment claim.  *AHA Sales, Inc.*, 867 N.Y.S.2d at 180

Accordingly, there are issues of fact precluding summary judgment on Plaintiff's unjust enrichment claim.  Defendants' motion seeking summary judgment should be GRANTED as to Plaintiff's claim under N.Y. Labor Law, but DENIED insofar as Plaintiff seeks to recover further commissions or incentive pay under the theory of unjust enrichment.

---

[26] References to "Kennedy Dep. Tr." are to pages of the transcript of Kennedy's deposition, filed as Plaintiff's Exh.C, and portions filed as Defendant's Exh. 3.

4.      **Vacation Pay**

Plaintiff also seeks to recover $ 40,565.98 for his vacation time that was accrued,

yet unused, as of the termination of his employment.  Complaint ¶ 11.  Defendant

argues in support of summary judgment that Plaintiff has already received payment for

his accrued but unused vacation time of 139.5 hours, at his base salary rate, such that

Plaintiff has been paid all that he is owed on this claim.  Defendant's Memorandum at

15-16.  Defendant also disputes that as of his termination, Plaintiff had accrued 295.5

hours of vacation, asserting Plaintiff has not explained "how he arrived at that number."

*Id.* at 15 n. 7.  In opposition to summary judgment, Plaintiff maintains the Employee

Handbook does not explicitly state that vacation time would be reimbursed at an

employee's base pay rate, Plaintiff's Memorandum at 18, that Plaintiff had always

received both his base rate of pay and his commissions when he took vacation time, *id.*

at 18-19, that Kennedy had assured SHC employees that the new vacation accrual

policy instituted by the release of the Employee Handbook in 2004 would not affect the

employee's vacation time pay, and that Plaintiff has identified several Recruiters who

received vacation pay at their average hourly commission rate of pay.  *Id.* at 20.  In

further support of summary judgment, Defendant characterizes Plaintiff's argument as a

*non sequitur* insofar as the fact that Plaintiff, as well as other Recruiters, while on

vacation, received both their regular pay calculated at the applicable base salary pay

rate, as well as their commissions that came due while each respective Recruiter was

on vacation, but that such policy does not require calculation of a vacation pay rate

based on a Recruiter's average hourly commission rate of pay, and that Kennedy was

without any authority to alter the terms of the written vacation policy set forth in the Employee Handbook.  Defendants' Reply at 6-8.

Preliminarily, Plaintiff, pursuant to N.Y. Labor Law § 198-c ("§ 198-c"), could have brought his claim for unused vacation time in his Administrative Claim filed with the DOL.  N.Y. Labor Law § 198-c(2) (providing the benefits or wage supplements for which an administrative claim may be made include vacation pay).  As discussed, Discussion, *supra*, at 16-19, Plaintiff is barred by the doctrine of *res judicata* from pursuing in this action any claim that was or could have been included in the Administrative Claim. Thus, Plaintiff, by failing to include in his Administrative Claim his request for accrued but unused vacation pay, is barred by the doctrine of *res judicata* from pursuing the claim in this action.

Plaintiff, however, argues that his claims for vacation pay are outside the scope of § 198-c which specifically excludes professionals earning more than $ 900 per week. Plaintiff's Memorandum at 21.  Defendant argues in opposition that Plaintiff's deposition testimony that he was a commissioned salesman establishes that Plaintiff was not exempt from § 198-c.  Defendant's Reply at 8 n. 11.

Although N.Y. Labor Law § 198-c(2) permits a discharged employee to recover in his administrative complaint accrued, yet unused, vacation time, the law also specifically exempts "any person in a bona fide executive, administrative, or professional capacity whose earnings are in excess of nine hundred dollars a week."  N.Y. Labor Law § 198-c(3).[27]  Plaintiff, however, maintains he was a "commissioned salesman" for SHC.

---

[27] The so-called "bona-fide executive exemption" does not preclude any employee, regardless of the nature of his or her position, from seeking the payment of wages and commissions under N.Y. Labor Law § 198.  *Pachter v. Bernard Hodes Group, Inc.*, 891 N.E.2d 279, 283-84 (N.Y. 2008) (answering in the affirmative question certified by United States Court of Appeals for the Second Circuit asking whether

Complaint ¶¶ 3, 6; Plaintiff Dep. Tr.[28] at 89-90.  Blatz also described Plaintiff as a

"commissioned salesman," Blatz Dep. Tr. at 53, and a "commissioned salesperson."  *Id.*

at 159.  This is consistent with the Claim for Unpaid Wages completed by Plaintiff on

January 17, 2006, in connection with his Administrative Claim on which Plaintiff

indicated his position was "commissioned sales."  Administrative Claim.  Significantly,

"commissioned salesman" is defined under New York Labor Law as "any employee

whose principal activity is the selling of any . . . services, . . . and whose earnings are

based in whole or in part on commissions.  *The term 'commission salesman' does not

include an employee whose principal activity is of a supervisory, managerial, executive

or administrative nature.*"  N.Y. Labor Law § 190(6) (italics added).  Accordingly, Plaintiff

cannot be both a commissioned salesman and "an employee whose principal activity is

of a supervisory, managerial, executive or administrative nature."  *Id.*

Plaintiff's annual base salary of $ 61,600 or $ 1,184.62 per week, is in excess of

the $ 900 weekly salary for which bona fide executives are exempt from § 198-c.  There

is, however, no other evidence in the record that could be construed as establishing that

Plaintiff's "principal activity" while employed by SHC was of "a supervisory, managerial,

executive or administrative nature."  In particular, Blatz, for whom Plaintiff worked until a

little more than one year before Plaintiff's employment with SHC ended, testified that

Plaintiff had no authority to terminate any other employees, Blatz Dep. Tr. at 42-43, 142,

that whenever Plaintiff acted "on a matter of that magnitude," other SHC employees

understood it was at the direction of Blatz, *id.* at 142, that any discipline or counseling

---

executives are employees within the meaning of N.Y. Labor Law for purpose of seeking unpaid commissions.
[28] References to "Plaintiff Dep. Tr." are to pages of the transcript of Plaintiff's deposition, filed as Plaintiff's Exh. A, and portions filed as Defendant's Exh. 1.

Plaintiff delivered to other SHC employees was at Blatz's behest, *id.* at 143-44, explaining that Blatz sometimes directed Plaintiff to counsel or discipline other employees when Plaintiff's demeanor was better suited to the occasion.  *Id.* at 142-44. Defendant points to no evidence establishing that the nature of Plaintiff's position, even after being promoted to Vice President of Recruiting on September 30, 2004, less than three months after Blatz's departure on July 8, 2004, was then "supervisory, managerial, executive or administrative," N.Y. Labor Law § 190(6), such that Plaintiff was unable to include in his Administrative Claim his claim for payment of accrued yet unused vacation time.  Accordingly, Plaintiff is barred by the doctrine of *res judicata* from asserting in this action his claim for accrued yet unused vacation time.

Alternatively, should the District Judge find there is an issue of fact as to whether Plaintiff worked for SHC as a bona fide executive, administrative or professional capacity and is, thus, exempt under § 198-c, the court observes that the only evidence in the record supporting Plaintiff's assertion that he had 295.5 hours of vacation time accrued yet unused as of the termination of his employment, rather than the 139.5 hours Defendant asserts Plaintiff had, is Plaintiff's statement in his September 12, 2005 e-mail to Erin Palmer that he had 295.5 hours of vacation time "based on my company paycheck."  The record is devoid of any copy of any paycheck indicating Plaintiff had 295.5 hours of vacation time when his employment was terminated; rather, a copy of Plaintiff's regular paycheck for the pay period ending January 8, 2005 indicates at that time Plaintiff had 259.5 hours available vacation time for the year 2005 should Plaintiff remain an employee and thus accrue vacation time, for the entire year.  Marsing Declaration Exh. E.  Although it is possible that Plaintiff's assertion that he had 295.5

hours vacation time available resulted from a transposition of the 259.5 hours available

at the beginning of 2005, Plaintiff's later paychecks, the accuracy of which Plaintiff has

not challenged, do not support Plaintiff's assertion that he had 295.5 hours of unused

vacation time for 2005.

Significantly, Defendants have submitted evidence in support of the 139.5

vacation hours they assert were available to Plaintiff when his employment was

terminated, including a spreadsheet showing as of the end of 2004 the accrued, but

unused, vacation for each SHC employee at the Buffalo office, including 103 hours for

Plaintiff.[29]  Marsing Declaration ¶¶ 15 and 16 and Exh. D.  This is consistent with the

copy of Plaintiff's paycheck for the pay period ending August 20, 2005 ("August 26,

2005 paycheck"),[30] showing that Plaintiff then had 199.5 hours of vacation time

available to take for the remainder of 2005 if Plaintiff remained a SHC employee for the

remainder of 2005, given that Plaintiff, then employed in his seventh year, accrued

vacation at the rate of 0.61302682 hours per day worked,[31] or 6.1302682 vacation

hours per pay period.  Plaintiff's final paycheck, however, indicated Plaintiff separated

service on September 2, 2005, such that Plaintiff did not accrue any additional vacation

for the final 8.5 pay periods of 2005, *i.e.*, 85 days.  Multiplying the 85 days for which

Plaintiff was no longer an employee for 2005 by the 0.61302682 hours per day that

Plaintiff would otherwise have accrued had he remained in SHC's employ produces 52

vacation hours Plaintiff did not earn in 2005.  Because Plaintiff's final paycheck

indicates Plaintiff received 8 hours of holiday pay, Defendant's determination that

---

[29] Although it is impossible to ascertain from the spreadsheet Plaintiff's unused but accrued vacation time as of the end of 2004 given the poor quality of the copy of the spreadsheet filed in support of summary judgment, Marsing Declaration Exh. D, Plaintiff does not dispute the accuracy of the number.
[30] Plaintiff's Exh. V.
[31] Per Defendant's Exh. R.

Plaintiff, as of September 2, 2005 had 139.5 hours of accrued but unused vacation time

is correct.[32]  Significantly, the record is devoid of any indication that Plaintiff ever

disputed the number of hours of accrued/unused vacation time that appeared on any of

his bi-weekly paychecks.  Nor does Plaintiff argue he continued to accrue vacation time

for the additional week the DOL found he separated service, *i.e.* the week ending

September 9, 2005.  Accordingly, the court finds no genuine issue of material fact that

Plaintiff had, as of his final paycheck for the pay period ended September 2, 2005,

139.5 hours of accrued, yet unused vacation, and the only issue is the rate of pay at

which Plaintiff was required to be compensated for the hours, a claim to which there is

no merit.

Dividing the amounts, shown on Plaintiff's final paycheck, that Plaintiff received

for regular pay by 64 hours, sick pay by 8 hours, vacation pay by 8 hours and

unused/accrued vacation pay by 139.5 hours, all yields an hourly rate of $ 29.615

which, multiplied by 40 work hours per week for 52 weeks a year produces Plaintiff's

annual salary of $ 61,600.[33]  It was at this rate that Defendant, as reflected in the final

paycheck, paid Plaintiff for the 139.5 hours of accrued yet unused vacation time, *i.e.*,

$ 4,131.35.[34]  Plaintiff, however, maintains he should have been compensated for his

accrued and unused vacation time at an hourly rate that takes into account his hourly

average commissions based on his commissions received in 2005 up to his date of

termination.  Plaintiff's Memorandum at 19-20.  Based on this argument, the hourly rate

---

[32] 199.5 vacation hours Plaintiff would have accrued through 2005 but for separating service, minus 8 hours vacation time used during the pay period ending September 2, 2005, minus 52 vacation hours never accrued based on Plaintiff's separation of service = 139.5 vacation hours accrued and unused as of September 2, 2005.
[33] $29.615 X 40 X 52 = $ 61,599.20.
[34] 139.5 hours accrued vacation time X $ 29.615 = $ 4,131.29; slight discrepancy attributed to rounding.

of pay at which Plaintiff seeks to be compensated for his accrued yet unused vacation time would be $ 137.27 calculated by dividing the claimed $ 40,565.98, Complaint ¶ 11, by the 295.5 hours of vacation time.  There is, however, no factual basis for the hourly rate Plaintiff seeks.

In particular, calculating the hourly vacation rate of pay by adding to Plaintiff's base rate of pay per his annual salary of $ 61,600 his average hourly commissions would result in Plaintiff receiving double commissions.  Plaintiff overlooks the simple fact that the commission pay he received while on vacation was just that – commissions that happened to be due and payable while Plaintiff was on vacation, yet remained in SHC's employ.  Paying Plaintiff his vacation pay according to a rate that includes both his base salary hourly rate in addition to an hourly commission rate determined by dividing Plaintiff's total commissions for 2005 up to the termination of his employment by the number of hours worked to that same date is speculative at best because it assumes that Plaintiff would have continued to receive commissions at that same rate while taking future vacation had Plaintiff continued as an employee of SHC.  Furthermore, by separately seeking commissions for those nurse placement contracts that were in progress but not yet completed when Plaintiff separated employment, as Plaintiff has done by asserting his claims for commissions under the theory of unjust enrichment, as well as pursuant to N.Y. Labor Law § 198, Plaintiff, if successful on either of his separate claims for commissions, would essentially receive those same commissions twice.  This is consistent with Blatz's explanation that while on vacation, SHC Recruiters received both their base salary pay and any commissions that were due and payable while the recruiters was on vacation.  Blatz Dep. Tr. at 47.  That Plaintiff and Blatz

differentiate between Recruiter Paid Time Off ("RPTO"), and Paid Time Off ("PTO"),

Plaintiff Dep. Tr. at 134-35, 217; Blatz Dep. Tr. at 47, refers only to the fact that

Recruiters continued to receive their commissions while on vacation, but does not

disturb the finding that the Recruiter's base pay remained the same.  This is also

consistent with Plaintiff's paychecks in the records showing that Plaintiff's vacation pay

was at his base salary rate of $ 29.61, but that Plaintiff continued to be paid

commissions for those weeks in which he also received vacation pay.  *See*, *e.g.*,

Defendant's Exh. 4 at SHC Giaimo 0148 (Plaintiff's paycheck for two-week period

ending August 20, 2009, indicating Plaintiff was paid for 20 hours of vacation, 4 hours of

sick time, and 56 hours regular salary, all at the hourly rate of $ 29.61, and also

received commissions of $ 12,663.59).  Moreover, that Plaintiff received any pay for his

unused vacation time is consistent with the Employee Handbook's provision that

"[e]arned and unused vacation will be paid out upon termination of employment."

Employee Handbook at 17.[35]

Defendant's motion should be GRANTED as to Plaintiff's request for vacation

pay.

## 5.     Breach of Contract

Plaintiff claims that Defendant, by failing to pay him the $ 120,885.96 Plaintiff

maintains he is owed as wages, benefits, commissions and wage supplements, have

breached the agreement Plaintiff made with Kennedy as memorialized by Plaintiff in his

September 2, 2005 e-mail to Kennedy.  Complaint ¶¶ 27-30.  Defendant argues in

---

[35] In contrast, the policy in effect under the Policy Manual issued by Blatz just prior to selling
Supplemental Health Care to the group of investors in 2000, provided that "[u]pon termination of
employment, employees will not be paid for unused vacation time that has been earned."  Policy Manual
at 9.

opposition to summary judgment that Plaintiff cannot establish a breach of contract

because he cannot establish that Defendant ever agreed to pay Plaintiff pursuant to any

post-separation agreement Plaintiff maintains he made with Kennedy.  Defendant's

Memorandum at 18-20.  In opposition to summary judgment, Plaintiff asserts he had an

oral agreement with Kennedy for post-separation severance, the consideration for which

was Plaintiff's resignation and agreement to release all claims against SHC, such that

the agreement is enforceable.  Plaintiff's Response at 21-22.  According to Plaintiff,

Defendant's offer on September 9, 2005 to pay Plaintiff $ 49,000, September 9, 2005 e-

mail, and Defendant's subsequent offer on September 13, 2005 to pay Plaintiff

$ 26,000, roughly equal to one month of Plaintiff's average commissions in exchange

for Plaintiff's execution of a release of claims against SHC, September 13, 2005 Letter,

establish the existence of material issues of fact as to whether Plaintiff and Kennedy

had reached an agreement for SHC to pay Plaintiff severance.  *Id.* at 22.  In further

support of summary judgment, Defendant argues Plaintiff's claim for breach of an oral

severance agreement is unpleaded, and that Plaintiff admits he and Kennedy never

reached the severance agreement on which Plaintiff seeks to recover.  Defendant's

Reply at 8-9.

        In his breach of contract claim, Plaintiff alleges that "Defendant's willful failure to

provide wages, benefits, commissions and/or wage supplements when due is in

violation of the written agreement between Plaintiff and Defendant."  Complaint ¶ 29.

The Complaint is silent as to any other severance agreement purportedly reached

between Plaintiff and Defendant.  As such, Defendant's assertion that Plaintiff's

argument that Defendant breached an oral agreement for severance reached between

Plaintiff and Kennedy on September 2, 2005, is correct, and Defendant's motion for summary judgment on Plaintiff's breach of contract claim should be granted.

Alternatively, the record fails to establish that Plaintiff and Kennedy ever reached an actual agreement for Defendant to pay Plaintiff severance pay in exchange for Plaintiff releasing SHC from any future claims.  Significantly, nothing in the record suggests that after Plaintiff sent Kennedy the September 2, 2005 e-mail detailing the commissions and unused vacation pay to which Plaintiff maintains he is entitled, Kennedy or any other SHC employee ever confirmed that SHC agreed with the amounts and that such amounts would be paid.  Rather, at most, the record contains evidence of some negotiations between Plaintiff and Kennedy over a severance package, for which Kennedy had no authority to commit SHC to pay but, rather, had to discuss with her superiors, and such discussions resulted in SHC offering two lower amounts in exchange for Plaintiff's releasing SHC from all future claims.  Evidence of negotiations, however, cannot establish the existence of an actual contract.  *Ross v. Wu*, 811 N.Y.S.2d 26, (1st Dept. 2006) (parties' continued "negotiations . . . showed that there was never a meeting of the minds on all essential terms" (citing cases)), *lv. denied* 857 N.E.2d 1136 (N.Y. 2006).

Accordingly, Defendant's motion for summary judgment should be GRANTED on Plaintiff's breach of contract claim.

## **CONCLUSION**

Based on the foregoing, Defendant's motion (Doc. No. 37) should be GRANTED

in part and DENIED in part.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      May 7, 2015
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        May 7, 2015
              Buffalo, New York